IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN THE MATTER OF:<br><br>FRANKLYN T. RIST,<br><br>                    Debtor(s). | CASE NO. BK22-41043-TLS<br><br>CHAPTER 7<br><br>ADV. NO. A23-4006-TLS |
| TIMOTHY RIST and RIST FARM, INC.,<br><br>                    Plaintiff(s),<br>vs.<br>FRANKLYN T. RIST,<br><br>                  Defendants(s). | **ORDER** |

This matter is before the Court on the plaintiffs' complaint to determine dischargeability of a debt under 11 U.S.C. § 523(a)(6). The matter was tried on January 31, 2024, in Lincoln, Nebraska. John C. Hahn appeared for the plaintiffs, and John D. Rouse appeared for the defendant. Exhibits and testimony were received, and the parties submitted written closing arguments. The matter is now ready for decision.

For the reasons explained below, the debt is discharged.

                                      I.        <u>Introduction</u>

The parties here are family members – the plaintiff Tim Rist is the father of defendant and debtor Frank Rist.[1] For reasons not stated in the record and not pertinent to the judicial resolution of this litigation, the parties' relationship fully deteriorated in June 2016. Contact since that time has been frosty and conducted mainly through legal counsel. Prior to 2016, the parties farmed together. As more fully discussed below, in 2011, they jointly purchased a farm. By 2017, Frank was in financial straits and did not make his share of the installment payments and tax payments on the farmland. He filed a partition action in which the land was sold and the proceeds disbursed. Tim received less from the sale than he felt he was owed. Tim also alleges he owned some straw that was stored in Frank's possession and which Frank either sold and/or let rot. After Frank filed a Chapter 7 bankruptcy petition, Tim filed this adversary proceeding to except the debt – the balance he believes Frank owes him from their joint farming operation – from discharge as having been caused by the debtor's willful and malicious conduct.

---

[1]This opinion will refer to the parties by their first names to avoid confusion. The court intends no disrespect by using this less formal form of address.

II. Findings of fact

At the trial, Frank and Tim testified in support of their respective positions, and an additional witness testified on Frank's behalf. Frank and his witness were abundantly credible. I found Tim's testimony to be slightly less credible, and he provided no additional witnesses to corroborate his version of events. The parties also relied on the answers given in their pretrial depositions. The testimony and documentary evidence establish the following facts.

Both individuals reside in rural Richardson County, Nebraska. Tim is the president, secretary, treasurer, director, and sole shareholder of Rist Farm, Inc. Frank is the president, secretary, treasurer, director, registered agent, and sole shareholder of FTR Farms, Inc.[2]

Frank farmed with his father from a young age. Frank started his own farming operation in 2006, but he and Tim continued to work together.

The land known as the Dowell farm had been in the Rist family for many years, and by 2011 was owned by Tim's aunt and uncle. Tim began farming that land in 1979, and testified at trial that one of his life's goals was to keep the property in the family.

On November 1, 2011, Rist Farm and FTR Farms purchased the Dowell farm, consisting of approximately 340 acres, as tenants in common, with each party owning an undivided one-half interest in the property. Rist Farm and FTR Farms financed the purchase of the Dowell farm by executing a promissory note to Eugene Wesley Dowell in the amount of $1,312,500.00. The terms of the note required payment of the principal balance with five percent interest in annual installment payments of $85,380.01 beginning on November 1, 2012, with final payment due on November 1, 2041. If an installment payment was not timely made, the terms of the note increased the interest rate to ten percent. If a payment was not made when due, or if there was a contract default, then the noteholder could declare the entire balance of the note and accrued interest due and payable at once. The note was secured by a deed of trust.

Rist Farm and FTR Farms orally agreed to each pay half ($42,690.00) of the annual installment payments. They also orally agreed to each pay half of the annual real estate taxes on the property, with Rist Farm making the first half payment and FTR Farms making the second half payment.

The Dowell farm was divided roughly in half by the North Fork of the Big Nemaha River. Frank farmed the north half of the property, and Tim farmed the south half. Three irrigation pivots irrigated the crops of the farm with river water; two pivots were on the north half and one pivot was on the south half. Rist Farm owned the pivot on the south half and one of the pivots on the north half, while FTR Farms owned the other pivot on the north half.

---

[2] For the most part, the individuals and the corporate entities will be referred to interchangeably in this opinion. The parties and the attorneys seem to have given up differentiating between the individuals and the corporations that actually owned the land. They treat each individual and his corporation as one and the same.

FTR Farms timely paid its share of the note payments through 2017. It also paid its share of the real estate taxes through the tax year 2016, which were due and payable in 2017. FTR Farms did not pay its share of the 2017 taxes due in 2018, nor did it make its share of the note payments after 2017. Frank admitted at trial that he knew FTR's failure to pay its share would cause a higher interest rate on future payments for both the note and the taxes.

For taxation purposes, the Dowell farm was divided into two parcels, which did not correspond to the halves of the property farmed by Rist Farm and FTR Farms. Parcel No. 0740038737 ("Parcel 38737") consisted of 297 acres, while Parcel No. 0740034014 ("Parcel 34014") consisted of 14 acres. FTR Farms' failure to pay its share of the 2017 real estate taxes caused a tax sale of Parcel 38737 to an investor. Rist Farm paid all of the taxes owed on Parcel 34014, including the amount owed by FTR Farms, to prevent a delinquency on that larger parcel.

Frank's financial difficulties appear to have begun in 2016, when his operating lender foreclosed on his note and sold his machinery and equipment. He began working that year as a farm hand for his neighbor Tyler Binder and continues to do so, in addition to conducting his own farming operation. Tyler farms with his family members, and the Binders front many of Frank's farming expenses, including fuel and crop inputs, and allow him to use their farm equipment. Their practice is to settle accounts at the end of the year. Frank had also given the Binders a deed of trust on the 120-acre farm where he lives as collateral, and they forced the sale of that property to recoup what they were owed.

Frank's FTR Farms filed a partition action against Tim's Rist Farm regarding the Dowell farm property in March 2017. Frank testified that he was out of money by that point and thought it wise to try to eliminate some debt. He testified that he thought the division and sale of the Dowell farm property was a way to get out from under that obligation and try to save the other farm where he lives. Frank characterized the partition action as a business decision made with the advice of legal counsel. When asked why he did not sell his half to Tim, he testified that he felt the offers made by Tim or on his behalf were too low.

In 2018, while the partition action was working its way toward a sale, Frank continued to farm the north half of the Dowell land with inputs paid for by the Binders. Frank and the Binders understood the Binders to have a lien on the crop as collateral for the inputs, although this lien was not perfected. Frank also felt that his continued employment with the Binders depended on paying them back. The Binders also advanced money for Frank's legal fees. All of the grain harvested on Frank's half of the Dowell farm was sold in Tyler Binder's name; he testified that the proceeds barely covered what he was owed for the inputs and other debts owed by Frank. Because the crop proceeds were paid to the Binders, FTR Farms was unable to make its 2018 note payment or pay its share of the 2017 property taxes. Frank also testified that because the farm was sold in 2018 and the Dowells would be paid from the proceeds, he felt no obligation to make his share of the 2018 payment, although he also knew that part of the burden of his non-payment would fall on Tim.

The partition sale gave rise to this adversary proceeding, for financial and emotional reasons. Frank testified at his deposition that, at or around the time the partition action was filed,

he and Tim discussed, via their attorneys, dividing the property between them with each party retaining the portion he was farming. Frank disagreed with this proposal because Tim's "half" was some 30 acres larger than Frank's "half." Tim then tried another option to save the farm (as well as forestall litigation expenses), testifying that he offered to purchase Frank's share of the Dowell farm for an amount equivalent to what Frank had paid in principal and interest on the note, but Frank declined because it was well below the market value of the land. Subsequently, the land was appraised and Tim offered to buy Frank's half of the farm for approximately $5,400 per acre, which was the appraised value of unirrigated farmland. Frank rejected that offer because the land is irrigated and therefore is worth more than dryland. At the time, Tim asserted that because the pivot equipment would not be sold with the land, the farm was dryland. However, at trial, Tim acknowledged that because the underground pipes which convey water from the river to the pivot equipment would be sold with the land, it could be considered irrigated land.

The farm was sold at public auction at the Elks Club in Falls City, Nebraska, on August 30, 2018. Testimony indicates the sale was well-attended. To bring the best price, the auctioneer first offered each half of the farm separately for bidding, and then offered the entire farm as one parcel to prospective buyers. Tim and/or Rist Farm bid successfully for the south half, but was outbid when the entire parcel was put on the auction block. Caleb and Cade Herr purchased the farm for $1,620,000.00, roughly the same price per acre that Tim had offered Frank previously for his half. Frank testified that he believed the sale proceeds would just about cover the mortgage debt on the farm, until he saw the referee's final accounting and realized that fees and expenses would take more of the proceeds than he anticipated.

Ultimately, Rist Farm received less from the sale than it was due. According to the referee, "FTR Farms' side [of the ledger] is upside down, in lieu of FTR Farms paying into the Closing, the additional amount needed to payoff the Dowell Deed of Trust will be withheld from the whole, as such Rist Farm, Inc. will receive $79,109.02 at closing rather than $105,238.65." Am. Final Accounting and Mot. to Authorize Referee to Pay Expenses and Disburse Sale Proceeds at 7, attached to the Dep. of Franklyn T. Rist (Fil. No. 25). FTR Farms and Frank did not receive any proceeds from the sale. Not only did they not receive any of the sale proceeds, they did not ever have control or possession of the proceeds. The referee appointed to oversee the partition action controlled and distributed those funds.

This $26,000 difference appears to be part of the "debt" Tim claims should be excepted from discharge.[3] At trial, Frank and Tyler Binder both testified about Tim's conduct at the auction, with the goal of demonstrating that Tim is responsible for some of his own damages. Mr. Binder testified that Tim made public comments at the auction about keeping the mineral rights to the farm and about his intent to destroy the underground irrigation pipe. Mr. Binder further testified that Tim was clearly emotional and visibly angry about the sale and seemed to glare at anyone who bid on the property. Mr. Binder testified that he, his father, and his brother opted not to bid on the farm in light of Tim's behavior, fearing there could be future trouble with him. Frank and Mr. Binder both testified that Tim's conduct had a chilling effect on the auction – where Frank expected the land to bring at least $7,500 per acre – and Frank opined that Tim's behavior was intended to

---

[3] In their post-trial brief, the plaintiffs state they paid $128,070 more on the Dowell note than Frank did and thus are actually owed approximately $49,000 instead of $26,000.

- 4 -

discourage competing bids so he could purchase the farm. Tim, under oath, denied these accounts of his actions but failed to produce a corroborating witness. Frank and Mr. Binder were adamant about what they observed.

In addition to the deficit on the sale of the Dowell farm, Tim also claims that Frank intentionally and maliciously damaged hundreds of straw bales that he believes were at least partly owned by Tim. Frank testified that 555 bales of straw have been stored since June 2016 on the farm where he lives. Some of the straw was produced on rented farmland and some on land that Tim and Frank owned. The wheat was harvested with Frank's equipment, although Tim testified that he paid all the rent and seed and fertilizer expense to produce the crop. Frank further testified that since 2006, it was customary for him to sell the straw and keep the proceeds as compensation for using his combine to harvest Tim's acres in addition to his own. Based on that history, Frank disputes Tim's ownership interest in the bales. The parties agree the bales were worth approximately $35,000 when they were placed on Frank's property, and are now worth next to nothing.

Tim argues that he owns the straw, and acknowledges that in previous years he did allow Frank to sell the straw so Frank would have some income. However, in 2016, Tim decided to claim ownership of all of the straw because he had paid the expenses for producing it.

Tim asserts that Frank deliberately avoided maintaining the quality of the bales to devalue it and cause financial injury to Tim. The straw is stored outdoors, and the bales were covered with tarps when they were first moved to Frank's place. Tim asserts that Frank sold some of the bales but didn't tighten or maintain the tarps to protect the remainder. Frank denies selling any of the straw, but he agrees that the tarps have been damaged by wind and weather and no longer offer much protection. Frank testified that he could not afford to purchase new tarps and Tim refused to turn over tarps in his possession that are owned by Frank, so the original tarps remain on the bales and continue to deteriorate (some of the tarps have completely disintegrated). Despite living only a quarter of a mile apart, Frank and Tim have not entered each other's property since 2016, so Tim says he could not tighten the tarps on the bales himself and Frank could not collect his tarps from Tim.

Frank further testified that his attorneys asked Tim's attorneys for permission to sell the straw in 2017 and 2018 while it still had some value and escrow the proceeds until the ownership interests could be determined, but Tim refused. For his part, Tim denies knowing anything about such an offer.

Frank filed a Chapter 7 bankruptcy petition on December 7, 2022. He listed a debt of $107,513.00 owed to Rist Farm on Schedule E/F. That debt was not identified as contingent, unliquidated, or disputed.

### III.  Conclusions of Law

Tim and Rist Farm filed this adversary proceeding alleging that the debt owed to them is non-dischargeable in bankruptcy because it resulted from a willful and malicious injury by the debtor. The plaintiffs' theory is that the parties' oral agreements concerning the Dowell farm financing arrangements and tax payments created a security interest in the Dowell farm, and Frank

wrongfully converted the plaintiffs' property by pursuing the partition action and causing the plaintiffs to receive less than they were owed from the sale proceeds. The plaintiffs allege Frank acted willfully and maliciously in failing to pay his share of the note and tax payments while paying the Binders instead, and in allowing the stored straw to deteriorate, all while knowing and intending that such actions would cause financial harm to the plaintiffs. While the plaintiffs' arguments are sincere, the facts do not support a § 523(a)(6) action. Instead, this presents more like a standard breach of contract action. Trying to turn it into a § 523(a)(6) action feels like an effort to fit a square peg into a round hole.

A debt may be excepted from the discharge of debts granted under 11 U.S.C. § 727 if it is "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). An action under § 523(a)(6) has three elements: (1) the debtor caused an injury to the creditor; (2) the injury must have been willfully inflicted – that is, the debtor must have desired the injury or must have been substantially certain that his conduct would result in the injury; and (3) the debtor's actions must have been malicious. *Luebbert v. Global Control Sys., Inc. (In re Luebbert)*, 987 F.3d 771, 778 (8th Cir. 2021). The party seeking to prevent discharge bears the burden of showing each element by a preponderance of the evidence. *Blocker v. Patch (In re Patch)*, 526 F.3d 1176, 1180 (8th Cir. 2008).

"Courts considering the applicability of the § 523(a)(6) exception to discharge must 'first determine exactly what injury the debt is for, and then determine whether the debtor both willfully and maliciously caused that injury.'" *Luebbert*, 987 F.3d at 780 (quoting *Patch*, 526 F.3d at 1181).

Under this section of the Bankruptcy Code, an "injury" is broader than physical harm. It encompasses legal injuries as well, including the "deliberate or intentional invasion of the legal rights of another." *Geiger v. Kawaauhau (In re Geiger)*, 113 F.3d 848, 852 (8th Cir. 1997), *aff'd sub nom. Kawaauhau v. Geiger*, 523 U.S. 57 (1998).

The plaintiffs allege financial injury as a result of the partition sale and because their straw deteriorated and lost value while in the defendant's possession and control. The fact that these injuries happened is not in dispute. The accounting from the partition sale clearly shows the plaintiffs were not made whole from the sale proceeds. Likewise, both sides agree that the straw was worth $35,000 when it was baled and is now essentially worthless. To the extent the plaintiffs own some or all of the straw, this loss is an injury. The question then becomes whether Frank willfully and maliciously caused the injuries.

Malice and willfulness are considered separately. "Evaluating willfulness requires an inquiry into the debtor's subjective intent to cause injury." *Luebbert*, 987 F.3d at 780.

> "'[W]illful,' standing alone, means intentional or deliberate." [*Barclays Am./Bus. Credit, Inc. v. Long (In re Long)*], 774 F.2d [875] at 880 [(8th Cir. 1985)] [citations omitted]. The creditor must prove "that the debtor desired to bring about the injury or was, in fact, substantially certain that his conduct would result in the injury that occurred." *Luebbert*, 987 F.3d at 780 (quoting *Patch*, 526 F.3d at 1180–81). "[N]ondischargeability takes a deliberate or intentional injury, not merely . . . a

> deliberate or intentional act that leads to injury." *Kawaauhau*, 523 U.S. at 61, 118 S. Ct. 974.

*AgHeritage Farm Credit Servs., PCA v. Durham (In re Durham)*, 639 B.R. 504, 539-40 (Bankr. E.D. Ark. 2022). *See also Sells v. Porter (In re Porter)*, 539 F.3d 889, 894 (8th Cir. 2008) (willful injury is one which involves a "deliberate or intentional invasion of the legal rights of another").

The plaintiffs must also prove the defendant acted with malice.

> "Malice requires 'conduct targeted at the creditor at least in the sense that the conduct is certain or almost certain to cause harm.'" *Luebbert*, 987 F.3d at 780 (quoting *Waugh v. Eldridge (In re Waugh)*, 95 F.3d 706, 711 (8th Cir. 1996)). The conduct must be "more culpable than that which is in reckless disregard of creditors' economic interests and expectancies." *Long*, 774 F.2d at 881. The debtor's "knowledge that legal rights are being violated is insufficient to establish malice"; there must be "some additional aggravated circumstances." *Id.* "A robust collection of bankruptcy court and circuit court authority suggests that the point of the malice inquiry is to determine whether the debtor's conduct was 'aggravated' or 'socially reprehensible' such that an imputation of malice is justified." *Luebbert*, 987 F.3d at 780 (citing *Bundy Am. Corp. v. Blankfort (In re Blankfort)*, 217 B.R. 138, 143–44 (Bankr. S.D.N.Y. 1998); *Rescuecom Corp. v. Khafaga (In re Khafaga)*, 419 B.R. 539, 550 (Bankr. E.D.N.Y. 2009)).

*Durham*, 639 B.R. at 545.

Because "[i]ntentional harm is difficult to establish, . . . the likelihood of harm in an objective sense may be considered in evaluating intent." *Osborne v. Stage (In re Stage)*, 321 B.R. 486, 493 (B.A.P. 8th Cir. 2005) (citing *Long*, 774 F.2d at 881).

    A.    The Dowell farm

Here, the plaintiffs argue (1) they had a security interest in the Dowell farm; (2) the defendant wrongfully converted the Dowell farm through the partition action; (3) the defendant acted willfully and maliciously by withholding funds that were rightfully owed to the plaintiffs;[4] and (4) the plaintiffs suffered substantial financial injury as a result of the defendant's conversion of the Dowell farm.

The basis for the plaintiffs' theory that they held a security interest in the Dowell farm is unclear, but appears to be based on the promissory note for the purchase of the farm and the parties' oral agreements concerning the division of the note and real estate tax payments. Because they owned the property as tenants in common with each having an undivided one-half interest in the property, the plaintiffs claim a one-half ownership in the crops grown on the defendant's portion

---

[4]Plaintiffs have no basis for making this statement in their brief. There was no evidence that Frank withheld any funds that belonged to the plaintiffs and Frank did not receive any proceeds from the partition sale.

of the farm. The plaintiffs provide no proof or legal support for this argument and failed to further expand on this argument. It seems clear that Tim's corporation was an owner of an undivided interest in the property, and was not a security interest holder.

The plaintiffs next argue that the defendant converted the plaintiffs' property by filing the partition action without the plaintiffs' consent and causing the property to be sold with the plaintiffs receiving less than they should have from the proceeds, and by paying the Binders from the 2018 crop instead of making the Dowell note payment. Plaintiffs assert that Frank's conduct was willful because he admitted knowing that his actions in not paying the note or real estate taxes would directly affect and cause problems for Tim on the Dowell contract, including a higher interest rate on both payments. He likewise knew that initiating the partition action would affect Tim's ability to retain the land, as well as the terms of the Dowell contract. Nevertheless, the defendant moved forward with the partition. The plaintiffs believe this evidence establishes "that the debtor desired to bring about the injury or was, in fact, substantially certain that his conduct would result in the injury that occurred." *Luebbert*, 987 F.3d at 780 (quoting *Patch*, 526 F.3d at 1180–81).

As the plaintiffs argue, "[w]hen a debtor impermissibly disposes of his own property subject to a security interest in favor of a creditor and fails to remit the sale proceeds to the creditor, the debtor *may* be liable for the tort of conversion." *Mercantile Bank of Ark. v. Speers (In re Speers)*, 244 B.R. 142, 145 (Bankr. E.D. Ark. 2000) (emphasis added). However, "[e]ven where conversion is proven, the case law is clear that conversion alone is not enough to prevent a debt from being discharged." *Farm Credit Servs. of Am., PCA v. Hylle (In re Hylle)*, 641 B.R. 203, 226 (Bankr. E.D. Ark. 2022) (citing *Long*, 774 F.2d at 879). As noted above, in this case, there is no evidence to support the idea that the plaintiffs held a security interest for which the sale proceeds were collateral, so the argument that the defendant converted the property or proceeds is misplaced.

The Court has serious reservations about such a willfulness analysis under the facts of this case. Did Frank willfully file the partition action? Of course he did. He testified that he filed it because he ran out of money and couldn't reach agreement with Tim on a sale price. So, he filed the partition action thinking it would bring enough money at sale to make everyone whole. So, yes, he did willfully file the partition action – but doing so is a specific statutory right held by co-owners of real estate under Nebraska law. It seems strange to fault someone for exercising a legal right and it certainly was not "impermissible" to dispose of his real estate by partition. Further, it is difficult to discern how filing a statutorily authorized partition action could possibly be considered to be the tort of conversion of property.

In any event, intentionally filing the partition action does not by itself constitute willfulness under § 523(a)(6). Plaintiffs failed to present any evidence that Frank intended to injure Tim and his company. In fact, the evidence showed that Frank believed the partition sale would make Tim whole – and believes it would have if Tim had not taken action to chill the bidding. "[N]ondischargeability takes a deliberate or intentional injury, not merely . . . a deliberate or intentional act that leads to injury." *Kawaauhau*, 523 U.S. at 61. Plaintiffs have failed to establish the willfulness element.

Even if the plaintiffs had established that Frank willfully caused injury by filing the partition action and that the partition sale and the resulting distribution of proceeds somehow constituted the tort of conversion – and such a conclusion is by no means established by the evidence or the argument – "[a] debtor's retention of proceeds of sales of collateral, while clearly a breach of a security agreement, is not enough to establish malice." *Johnson v. Logue (In re Logue),* 294 B.R. 59, 63 (B.A.P. 8th Cir. 2003).

Importantly, when a debtor uses the proceeds of the sale of collateral belonging to another to try to save his own business, such conduct is not generally considered to be malicious. "Where a debtor has used the proceeds in an attempt, albeit unsuccessful one, to keep a business afloat, malice may not necessarily be inferred from the debtor's conduct." *Logue*, 294 B.R. at 63 (citing *First Nat'l Bank of Fayetteville v. Phillips (In re Phillips)*, 882 F.2d 302, 305 (8th Cir. 1989) and *Long*, 774 F.2d at 882)).

Frank credibly testified that his intention in filing the partition action was to get out from under the Dowell debt and attempt to save some of his other land. His testimony was credible. Tim believes otherwise, a belief likely stoked by the fractious nature of their relationship, but there is no evidence of "additional aggravated circumstances" beyond Frank's knowledge that the plaintiffs' "economic interests and expectancies" could be harmed by his actions. Instead, the evidence clearly indicates Frank felt trapped by his financial situation and did what he could to try to straighten things out.[5] Part of his solution was to obtain financing from the Binders, and he made the business decision to repay them first from his Dowell crop proceeds because doing so would allow him to continue farming with their financial support. By, in essence, robbing Peter to pay Paul, Frank solved one problem, but at the expense of the plaintiffs. Nonetheless, malice requires "conduct more culpable than that which is in reckless disregard of creditors' economic interests and expectancies." *Long*, 774 F.2d at 881. The evidence here does not prove that the defendant acted maliciously in causing the Dowell land to be sold at auction.

With regard to the plaintiffs' argument that they are entitled to more of the partition sale proceeds than they received because they paid more on the promissory note than the defendant

---

[5]*See, e.g.*, Frank's deposition testimony:

> 10  Q. [by Mr. Hahn] All right. Knowing -- when you filed this
> 11  partition action, did you understand and know that
> 12  those costs were going to be incurred?
> 13  A. Partially, yes.
> 14  Q. Okay. So when you filed your partition
> 15  action you were focusing mainly on - - on causing
> 16  damages or issues to Rist Farms; were you not?
> 17  A. No.
> 18  Q. Okay. Why not?
> 19  A. Trying to get my -- make my financial issues
> 20  go away.

F. Rist Dep., 20:10-20 (Fil. No. 25).

did, it is clear there was a deficit. It is not at all clear that the defendant should be responsible for erasing the deficit. In fact, it is quite clear that this purported debt should not be excepted from discharge as a willful and malicious injury. As explained above, by 2017 the defendant had more debts than money. With not enough to go around, he had to make difficult decisions about what to pay and what to let go. The animosity and lack of communication between the parties didn't help the situation. The defendant knew the plaintiffs could suffer repercussions from his decisions concerning the Dowell farm, but, again, there is no evidence of malice such that § 523(a)(6) would apply.

      B.      Straw

The plaintiffs assert the defendant knowingly and intentionally caused $35,000 worth of damage to Rist Farm by failing to protect the straw bales from the elements and allowing them to deteriorate, and they argue that amount should be excepted from discharge under § 523(a)(6). As with the Dowell property, the plaintiffs are unable to establish the necessary elements of § 523(a)(6). In fact, the evidence does not support either factor.

The plaintiffs claim Frank sold some of the straw to an unknown party – based on their observation of a semi-truck leaving the premises – and did not tighten the straps on the tarps covering the remaining bales. Frank testified that he did not sell any of the straw to anyone, and that the tarps simply weathered and tore. The parties' outlandish stubbornness prevented either of them from fixing the problem, with Frank testifying he couldn't afford to purchase new tarps and wasn't allowed to use tarps that were in Tim's possession, and Tim testifying there were tarps at Frank's that could have been used. Regardless of the spat about the tarps, there was testimony that – again, through attorneys – Frank asked Tim to sell the straw while it still had some value and put the proceeds in escrow to be distributed after the parties' rights had been determined, but Tim refused. That attitude is unfortunate, but typifies the parties' ongoing Cold War.

None of the evidence about the straw demonstrates that Frank's conduct was intentional or deliberate or "socially reprehensible." It was not willful or malicious. It may have been indifferent, or even negligent, and certainly was intransigent, but "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." *Kawaauhau v. Geiger*, 523 U.S. at 64. Further, there certainly was no solid evidence as to who actually owned the straw – that is, whether Tim's sudden departure from their course of dealing over many years by now claiming ownership of the straw has any legal basis. There also was no evidence that Tim made any effort to mitigate his purported damages, whether through basic communication or even through legal channels. The straw dispute is just that – a dispute between two people who no longer care for each other. But the evidence failed to establish a willful and malicious injury.

      IV.     <u>Conclusion</u>

Frustration over the manner in which this family farming relationship devolved – and the crushed hopes and dreams that resulted – along with the desire to punish the debtor for his part in the disappointing outcome have brought the parties to the bankruptcy courtroom, but this court is unable to render a decision that will provide a satisfactory resolution. The issues here are far more significant than money. Nevertheless, the court is obliged to rule on the evidence before it, and the

evidence in this case does not support a finding that the defendant caused a willful and malicious injury to the plaintiffs.

    IT IS ORDERED: The plaintiffs' complaint to determine non-dischargeability of a debt under 11 U.S.C. § 523(a)(6) is denied. The debt is discharged. Separate judgment will be entered.

Dated: March 13, 2024

BY THE COURT:

/s/ Thomas L. Saladino
Chief Judge

Notice given by the court to:
    *John C. Hahn
    John D. Rouse
    U.S. Trustee

*Movant is responsible for giving notice to other parties if required by rule or statute.